IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

| | |
|---|---|
| GRACE CALDWELL and ) | |
| LATONYA CALDWELL, ) | |
| ) | |
| Plaintiffs, ) | 08 C 0710 |
| ) | Judge Kocoras |
| v. ) | |
| ) | |
| CITY OF CHICAGO, et al., ) | |
| ) | |
| Defendants. ) | |

**STATEMENT OF UNCONTESTED MATERIAL FACTS IN SUPPORT OF
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

Chicago police officers Alejandro Gallegos, Marco Bruno, Jimmy Woods, Brian Leahy, John Lucid, David Greenwood, Nathan Hamilton, and Matthew Little ("individual defendants") and the City of Chicago ("City") [collectively "the defendants"], pursuant to Local Rule 56.1(a)(3), submit this statement of material facts as to which there is no genuine dispute and which entitle the defendants to judgment as a matter of law. The pleadings affidavits, deposition transcripts, and exhibits cited to in this statement are attached hereto.[1]

**Parties, Complaint, Jurisdiction, and Venue**

1. In February 2008, Grace and Latonya Caldwell ("the Caldwells") filed a complaint against the City, Chicago Police Officer Alejandro Gallegos, and unknown defendants, alleging violations of federal and state laws for unreasonable search and procurement of warrant. Thereafter, the Caldwells filed a four-count amended complaint naming as defendants the City and eleven Chicago police officers. See First Amended Complaint for Violation of Civil Rights ("Complaint").[2]

---

[1] These facts are undisputed only for the purpose of the defendants' joint motion for summary judgment. We reserve the right to dispute any of these facts for all other purposes, including trial.

[2] The eleven police officers named in the amended complaint are: Alejandro Gallegos, Marco Bruno, William Lipke, Jimmy Woods, Brian Leahy, John Lucid, David Greenwood, Nathan Hamilton, Matthew Little, Derrick Denton, and Darryl Edwards.

2.      On March 15, 2010, the Caldwells filed an agreed stipulation voluntarily dismissing with prejudice all claims against three police officers and one count against all defendants . See Docket Entry No. 69 (Stipulation to Dismiss).  Upon entry of the stipulation, the defendants remaining in this lawsuit will be: Alejandro Gallegos, Marco Bruno, Jimmy Woods, Brian Leahy, John Lucid, David Greenwood, Nathan Hamilton, Matthew Little ("individual defendants") and the City of Chicago ("City") [collectively "defendants"].  The claims remaining in this lawsuit will be: unreasonable search (Count I); unreasonable procurement of search warrant (Count II); and trespass (Count III).

3.      The individual defendants are police officers, employed by the Chicago Police Department.  Complaint at ¶¶ 5, 6, 8, 9, 10, 11, 12, 15.

4       The City is a municipal corporation organized under the laws of the State of Illinois.  Id. at  ¶ 16.

5.      The Caldwells bring this action under the laws of the United States. The court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b). Id. at  ¶¶ 1, 2.

6.      Officers Alejandro Gallegos and Marco Bruno have been employed with the Chicago Police Department for several years.  Exh. A at 4:18-20 (Gallegos deposition); Exh. C at 5:5-7 (Bruno deposition).

7.      In November 2007, Officers Gallegos and Bruno were assigned to the Chicago Police Department's Area Four Project Safe Neighborhoods Team ("PSN").  PSN is a federal task force funded by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and other federal agencies, and is designed to target violent crimes dealing with narcotics and firearms.  Exh. A at 6:8-10, 15:12-16; Exh. B at ¶ 2 (Gallegos affidavit); Exh. C at 5:8-14; Exh. D at ¶ 2; (Bruno affidavit);  Exh. E at 5:11-13 (Greenwood deposition);  Exh. F at ¶ 2 (Lucid affidavit).

**The Confidential Informant**

8.      On November 21, 2007, Officer Gallegos received a telephone call from a confidential informant ("CI") who asked to meet with him in person.  Exh. A at 16:17-23, 18:17-19; Exh. G at 1 (Search Warrant Complaint).

9. Officer Gallegos had known the CI for the past eight months and knew him to be reliable. Exh. A at 15:21-23, 31:14-15; Exh. B at ¶ 3; Exh. G at 1. In the preceding three months, the CI had given Officer Gallegos information about narcotics sales on five separate occasions, four of which had led to arrests and recovery of contraband. Exh. A at 31:16-23; Exh. B at ¶ 3; Exh. G at 1-2.

10. Later that evening, Officers Gallegos and Bruno met face to face with the CI for several hours. Exh. A at 18:20-23, 19:3-12; Exh. B at ¶ 4; Exh. C at 8:24-9:1, 13:1-4; Exh. D at ¶ 3.

11. The CI told the officers that for the last six months he had purchased heroin from a black male known as "Silo" (later known to be Shiloh Caldwell), whose address was the second floor apartment at 1921 South St. Louis, Chicago [hereafter "the Apartment"]. Exh. A at 32:14-19; id. at 33:9-14; id. at 34:3-8; id. at 35:23-24; Exh. B at ¶ 4; Exh. D at ¶ 3; Exh. G at 2.

12. The CI stated that on November 21, 2007, he was with Shiloh at the Apartment where he saw, among other things, a large amount of heroin, paraphernalia for cutting and packaging heroin, and currency in the amount of approximately $3,500.00. Exh. A at 36:19-37:5; Exh. B at ¶ 5; Exh. D at ¶ 4; Exh. G at 2. The CI also told the officers that Shiloh had told the CI that he was packaging the heroin because he intended to sell a lot at a discount price of "two for ones" for the upcoming holiday weekend. Exh. B at ¶ 6; Exh. D at 5; Exh. G at 2.

13. The CI also told Officers Gallegos and Bruno that there were large, aggressive dogs at the Apartment. Exh. A at 128:14-16; Exh. B at ¶ 11; Exh. D at ¶ 10. The CI stated that he believed there were guns in the Apartment. Exh. A at 74:20-23; id. at 75:1-3; Exh. B at ¶ 11; Exh. D at ¶ 10. This belief was based on the "criminal nature of the target" or the "potential for violence directly associated with illegal narcotics." Exh. A at 75:20-24, 76:1-3.

**Verification Of The CI's Information**

14. Officer Gallegos searched the Chicago Police Department's computer data system known as "I Clear" for the property located at 1921 S. St. Louis. Exh. A at 41:12-17, 45:11-13; Exh. B at ¶ 7; Exh. D at ¶ 6. The computer data system showed that a Shiloh Caldwell had been arrested previously and had given 1921 S. St. Louis as his home address. Exh. A at 42:2-7, 44:20-22; Exh. B at ¶ 7; Exh. C at 9:21-10:2; Exh. D at ¶ 6.

15. Officer Gallegos also conducted an I Clear search on Shiloh; that search revealed that Shiloh had been arrested several times and was a convicted felon. Exh. A at 44:9-12, 62:8-9; Exh. B at ¶ 8; Exh. D at ¶ 7.

16. Officers Gallegos and Bruno obtained Shiloh's photograph from the I Clear database and showed it to the CI, who identified the person in the photo as the person he knew as "Silo," the seller of narcotics from the Apartment. Exh. B at ¶ 9; Exh. D at ¶ 8; Exh. G at 2.

17. By way of further corroboration, Officers Gallegos and Bruno then drove with the CI in a covert vehicle to 1921 S. St. Louis, where the CI positively identified the Apartment as the place where he had last had contact with Shiloh earlier that day. Exh. A at 39:9-18; Exh. B at ¶ 10; Exh. C at 9:13-14, 13:1-4; Exh. D at ¶ 9; Exh. G at 2.

**Search Warrant**

18. Based on this information, on November 21, 2007, Officer Gallegos prepared a search warrant and a complaint for the warrant. Exh. A at 11:5-18, 12:14-17; Exh. B at ¶ 13; Exh. D at ¶ 11. See also Exh. G and H. Both the warrant and the complaint were reviewed and approved by an assistant state's attorney on the same date. Exh. A at 11:21-23; See also Exh. G and H.

19. In the complaint for the search warrant, Officer Gallegos, in one place, referred to Shiloh's residence as "1921 N. Karlov," instead of 1921 South St. Louis. See Exh. G at 2. Officer Gallegos explained in his deposition that "N. Karlov" was a typographical error – a mistake on his part – and that the CI had given 1921 S. St. Louis as Shiloh's address. Exh. A at 34:20-24; id. at 35:1-7, 19; id. at 36:3, 13-18.

20. On November 23, 2007, Officers Gallegos and Bruno went before a Cook County Circuit Court judge with the complaint and search warrant in hand to request that the search warrant be issued, and Officer Gallegos signed the complaint under oath. Exh. B at ¶ 14; Exh. C at 14:6-9; Exh. D at ¶ 13; Exh. G, H.

21. The judge found there was probable cause and, on November 23, 2007 at 12:48 p.m., issued a warrant authorizing the search of "Shiloh Caldwell A,K.A. 'Silo'" and the Apartment. Exh. H. The warrant also authorized the seizure of heroin, documents showing residency, any paraphernalia used in the weighing, cutting or mixing of illegal drugs, as well as any money and records detailing illegal drug transactions. See id.

**Events And Status Before Execution Of The Search Warrant**

22. Before executing the search warrant, Officer Gallegos contacted HIDTA, a clearinghouse system, to determine whether there were other law enforcement agencies investigating Shiloh Caldwell or the property located at 1921 S. St. Louis. Exh. A at 72:5-24; Exh. B at ¶ 15.

23. Officer Gallegos learned from Special Agent James Laverty, a group supervisor at the Drug Enforcement Administration, that Shiloh was a target of the DEA and the Apartment was Shiloh's address. Exh. A at 72:5-7, 69:13-16; Exh. I at 8:10-20 (transcript of 11/20/2008 criminal proceedings in People v. Shiloh Caldwell, No. 08 CR 0669201)

24. Agent Laverty asked to accompany Officer Gallegos for the execution of the warrant. Exh. A at 99:7-14; Exh. B at ¶ 17; Exh. I at 8:10-17.

25. On November 23, 2007, Officer Gallegos informed his sergeant, John Lucid, that he had obtained a search warrant for Shiloh Caldwell and the Apartment, and suggested that it be executed that day. Exh. B at ¶ 18; Exh. F at ¶ 3.

26. Before executing the search warrant, Officer Gallegos conducted a pre-search meeting with several members of his PSN team, and other officers ("the team"). Exh. A at 73:22-24, 74:2-5. At the meeting, Officer Gallegos discussed the search warrant complaint and the warrant, and gave each member of the team an assignment. Exh. A at 74:10-14. He showed the team a photo of 1921 S. St. Louis, as well as a photo of Shiloh. Exh. B at ¶ 19; Exh. D at ¶ 14.

27. Agent Laverty, as well as another federal agent, Raymond Dowling (from the ATF) were present for the pre-search meeting. Exh. J at 19:8-10, 19:13-14 (Laverty deposition).

28. At that point, the following information was known to the team: Shiloh was a dangerous felon, who, in the past was known to be in possession of firearms; he lived in the Apartment; large amounts of narcotics were being sold from the Apartment; and firearms and large aggressive dogs were in the Apartment. Exh. B at ¶¶ 4, 5, 6, 7, 8, 9, 10, 11; Exh. D at ¶¶ 3, 4, 5, 6, 7, 8, 9, 10.

29. In November 2007, the building located at 1921 South St. Louis was owned by Grace Caldwell. Exh. K at 23:9-12 (Grace deposition). The building had one apartment on each of the two floors and one apartment in the basement. Id. at 33:1-4; Exh. O at 26:14-16 (transcript of 11/19/2008 criminal proceedings in People v. Shiloh Caldwell, No. 08 CR 0669201).

5

30.     In November 2007, Grace Caldwell, Latonya Caldwell, and her son, all lived in the second floor apartment and Grace's son, Archie Caldwell, lived in the basement apartment. Exh. L at 11:6-7 (Latonya deposition); id. at 11:22-24; id. at 12:1-8.

31.     Grace's grandson, Shiloh, had lived in the building for several years on and off until December 2006.  Exh. K at 14:22-24; id. at 15:1; Exh. M at 11:24, (Shiloh deposition); id. at 12:4-5.  He also received mail addressed to him at 1921 S. St. Louis—some of which may have possibly been addressed to the second floor—including bills, credit card statements and a life insurance policy.  Exh. M at 16:9-11; id. at  24:21-24; id. at  25:6; id. at  26:1-3, 10; id. at 49:15-20; id. at  50:1-7; id. at 51:21-23; id. at 84:8-10; id. at 85:5-10.

32.     In 2007, although Shiloh did not live at the 1921 South St. Louis address, he visited his grandmother there at least ten times, and may have spent the night.  Exh. M at 21:17-24; id. at 22:1-2; id. at 24:10-14; Exh. K at 19:11-13.

33.     Shiloh's Illinois State driver's license and his cars were registered to 1921 S. St. Louis. Exh. M at 16:24; id. at 17:1-2; id. at 35:11-12; id. at 36:7-8; id. at 38:13-15; id. at 39:16-21; id. at 118:4-7,14-20, 23-24; id. at 119:14-21; id. at 120:12-14.

**Execution of Search Warrant**

34.     On November 23, 2007, at about 7:30 p.m., Officer Gallegos and the team, along with Agent Dowling and Agent Laverty, arrived at the Apartment to execute the warrant.  Exh. A at 78:12-17; Exh. B at ¶ 20; Exh. C at 14:14-19; Exh. D at ¶ 15; Exh. E at 7:7-10; Exh. N at 7:13-15 (Dowling deposition); id. at 8:4-5; Exh. O at 5:13-24; id. at 6:1-18; id. at 24:23-24; id. at 25:1-21; id. at 26:8-11.

35.     Officer Gallegos, along with a several members of the team, entered the exterior front door of the building by pushing open the unlocked door to the building and proceeded up the stairs to the second floor.  Exh. A at 78:15-24; id. at 79:1-2.

36.     Officer William Lipke, who had been assigned a shotgun to deal with the large aggressive dogs, and Officer Jimmy Woods were immediately next to Gallegos, and Officer Bruno was behind him.  Exh. A at 79:20-24; id. at 80:1-9.  Officer Greenwood and Sgt. Lucid were in the stairwell.  Exh. E at 7:18-23; Exh. F at ¶ 7.

6

37. Upon reaching the front door of the second floor apartment, Officer Gallegos pounded on the door more than ten times and announced his office. Exh. A at 80:21-23; id. at 81:3-9; Exh. B at ¶ 21; Exh. D at ¶16.

38. Officer Bruno was standing right behind Officer Gallegos and heard him knock and announce. Id.; Exh. C at 15:12-21. Officer Woods was behind Officer Gallegos and heard him knock and announce. Exh. P at 17:24; id. at 18:1-16. Officer Lipke observed the knock and announce. Exh. Q at 9:1-5; id. at 9:22-23. Officers Greenwood and Leahy testified that they heard Officer Gallegos announce, "Chicago Police, search warrant." Exh. E at 8:11-17; Exh. R at 11:11-19. Lieutenant Hamilton was in the stairwell and heard Gallegos knock and announce. Exh. S at 8:24; id. at 9:1-8. Sergeants Little and Lucid also observed Officer Gallegos knock and announce. Exh. F at ¶ 7; Exh. T at 12:7-10; id. at 23:13-20.

39. Officer Gallegos then made entry by pushing on the door with his shoulder. Exh. A at 81:16-20.

40. The police officers and the federal agent who entered the Apartment testified that it was very messy, unclean, and generally in disarray. There were numerous bags of clothes and items in boxes cluttering the Apartment throughout. Exh. A at 118:13-24; id. at 119:1; id. at 119:11-19 (Gallegos); Ex. C at 20:8 (Bruno); Exh. F at ¶9 (Lucid); Exh. N at 17:6-15 (Dowling); Exh. R at 14:11-12 (Leahy); Exh. J at 11:2-13. According to Agent Dowling, who helped Officer Greenwood search the room where firearms were recovered, the room was filled with clutter and bags of clothing. Exh. N at 17:6-15. As he put it, "the stuff was probably up to my chest. We were just digging stuff out of that bedroom." Id.

41. The officers observed two large aggressive dogs barking loudly on the back porch of the Apartment. Exh. A at 128:17-20; Exh. B at ¶ 22. Exh. D at ¶ 17; Exh. F at ¶ 11; Exh. N at 13:21-24; id. at 14:1; Exh. P at 24:21-24; id. at 25:1-16. See also Exh. M at 71:13-14, id. at 71:22-24 (Shiloh's testimony that his grandmother had dogs in the Apartment).

42. That evening, Grace, Latonya, Latonya's son, and Archie were in the Apartment. Exh. K at 37:2-4; Exh. L at 45:14-24.[3]

---

[3] All of the Chicago police officers and agents who entered the Apartment during the search testified that they saw Grace, Archie, and a child in the Apartment. No one saw a young female who answered to Latonya's description. See, e.g., Exh. B at ¶ 23 (Gallegos); Exh. D at ¶ 18 (Bruno); Exh. F at ¶ 8 (Lucid); Exh. N at 12:12-14 (Agent Dowling); Exh. S at 13:18-24; id. at 14:1-2 (Hamilton). For purposes of summary judgment, however, we accept the Caldwells' version that Latonya was present when the warrant was executed.

43. When the officers entered the Apartment, Grace was in her bedroom, located past the living/dining room, at the eastern end of the Apartment. Exh. K at 38:12; id. at 38:18-20. She was lying in her bed watching television. Id. at 36:20-22; id. at 38:6-8.

44. Grace did not hear Officer Gallegos knock or announce his office. Exh. K at 65:16-19.

45. Archie Caldwell was in the living room with the television on. Exh. K at 55:2-4.

46. Grace heard a loud noise as the door to the Apartment was struck. Exh. K at 37:23-24; id. at 38:1-2. She saw shadows of people coming in the door. Id. at 39:24; id. at 40:1-8; id. at 43:5-6; id. at 43:14. About a minute or two later, a sandy-haired police officer, came into Grace's bedroom, with a gun and a flashlight pointed at her. Id. at 43:20-23; id. at 57:16-18; id. at 58:1-2. At that point, Grace was still lying on her bed, propped up on her arm. Id. at 61:10-11. When the officer reached Grace, he helped her to sit up and told her to be quiet. Id. at 61:6-8

47. The sandy-haired officer searched Grace's chest of drawers and looked in her jewelry boxes in her bedroom for 30-60 minutes. Exh. K at 61:24; id. at 62:1-2; id. at 62:10-11; id. at 63:4-6. After that, Grace was escorted into the living room, where she sat on the couch for the duration of the search. Id. at 62:16-23; id. at 73:13-14. Grace was never handcuffed. Id. at 73:19-23.

48. When the officers first entered the Apartment, Latonya was with her son lying in her bed watching television with the door closed. Exh. L at 45:14-24; id. at 46:2-3; id. at 47:14-15; Exh. K at 55:14-20. She heard a loud boom. Exh. L at 46:1921.

49. Latonya did not hear the officers knock or announce their office. Complaint at ¶ 18.

50. As Latonya was about to open the door, it was pushed in towards her. Exh. L at 47:14-15. Latonya saw a flashlight and guns pointed at her. Id. at 47:16-17; id. at 50:3-4. She heard people screaming, "let me see your hands" and "get on the floor." Id. at 47:17-22. An officer came behind Latonya and handcuffed her. Id. at 48:5-9.

51. Latonya remained in her bedroom for five minutes with the officers before she was escorted into the living room, where she sat down on the couch with her grandmother. Exh. L at 59:10-13.

52. The police officers were in the Apartment for approximately two hours. Exh. K at 74:24; id. at 75:1-2.

8

53. During the search, the lock on the front door of the building was broken and some paint was missing. Exh. K at 87:13, 24. The officers took clothes and other items out of the bedrooms and the storage room and scattered them on the floor of the living room. Id. at 80:13-15; id. at 102:6-8; id. at 102:22-23; id. at 104:17-21. The officers damaged the clothes by stepping on them. Id. at 97:9-15. The officers "trash[ed] the house." Exh. L at 43.

54. The officers damaged dressers, Exh. K at 116:5-7; id. at 208:8-14; Exh. L at 30:12-16; id. at 32:11-14; damaged a scanner/fax machine, id. at 87:21-22; damaged Latonya's bed by standing on it and breaking the springs, causing her to replace them at a cost of $50, Exh. K at 207:21-24; id. at 208:1-7; id. at 214:13-15; damaged the stove in the kitchen, id. at 111:20-22; cut open a hole in Latonya's bedroom wall, id. at 186:20-21; id. at 187:6-8; and damaged doors, id. at 94:18-19.

55. Grace testified that as a result of the search, she was stressed, has difficulty swallowing "big food," and is scared when people knock on the door or ring the doorbell Exh. K at 210-211. Latonya testified that she experienced emotional distress, but had not sought treatment. Exh. L at 35:17-24.

56 The police officers removed a computer estimated to be worth $1,500 and took about $3,500 in cash. Exh. K at 158:16; id. at 174:19; Exh. L at 30:12-16.

57. Agent Laverty testified that he recommended the seizure of the computer and eventually took custody of it. Exh. J at 17:23-24; id. at 18:1-19.

**Firearms And Document Recovered During Search**

58. During the search, Officer Greenwood found four loaded firearms: a semiautomatic weapon, a shotgun, and two revolvers. Exh. E at 14:13-17; id. at 18:16. In addition, he recovered numerous calibers of ammunition. Id. The two handguns were found underneath the sofa cushions. Id. at 31:23-24; id. at 32:1-5.

59. Agent Dowling assisted Officer Greenwood in the search. Exh. N at 8:12-13; id. at 9:1-10. He observed Officer Greenwood recover the firearms from underneath clutter and clothes, and also observed Officer Greenwood recover ammunition. Id. at 9:20-24; id. at 10:1-2; id. at 16:23-24; id. at 17:1-5.

60. Agent Laverty saw the recovery of firearms from underneath clothing and books in the Apartment. Exh. J at 23:13-20.

61. In addition to the firearms and ammunition, Officer Greenwood recovered a

9

statement from a life insurance company that contained the name "Shiloh Caldwell" as one of the insured and was addressed to Charlotte Caldwell, 1921 S. St. Louis FL.1. Exh. E 14:18-19; id. at 16:3-14; id. at 18:5.

62. On March 18, 2008, Officers Greenwood and Bruno arrested Shiloh Caldwell. Exh. O at 18:16-24; Exh. U (Shiloh's arrest report).

63. Later, a grand jury returned an indictment charging Shiloh with unlawful use of a weapon by a felon in a number of different counts. Exh. V (report of 5/7/2008 court proceedings in People v. Shiloh Caldwell, No. 08 CR 0669201).

**Shiloh Caldwell Testimony**

64. Shiloh testified that the federal authorities impounded his car when he was arrested in March 2008. Exh. M at 35:14-15; id. at 37:3; id. at 37:14-16.

65. Shiloh may have gone to the Apartment on the afternoon of November 23, 2007. Exh. M at 52:12-15; id. at 52:19.

66. Shiloh has owned at least one firearm in the past. Exh. M at 58:13-14. He asserted his Fifth Amendment rights and refused to answer whether he had owned or purchased other firearms, or whether he ever had them inside 1921 S. St. Louis. Exh. M at 58:20-21; id. at 59:2-5; id. at 59:8-13; id. at 60:6-12; id. at 60:20-24, id. at 61:18-23, id. at 62:3-16. He denied ever having any weapons inside 1921 S. St. Louis in the second floor apartment. Id. at 60:16-19.

67. Shiloh was convicted of felony unlawful use of a weapon in 1996. Exh. M at 63:13-22.

68. Shiloh asserted his Fifth Amendment rights and refused to answer any questions as to whether he had ever been in possession of drugs or had been arrested for weapons or narcotics, whether he ever had drugs at the Apartment, whether he ever sold or purchased drugs and whether he sold drugs from 1921 S. St. Louis. Exh. M at 73:16-18; id. at 74:7-9; id. at 74:23-24; id. at 75:1; id. at 75:10-11; id. at 75:17-18; id. at 82:10-12.

**City of Chicago's Reimbursement Procedure for Accidental Property Damage**

69. The City of Chicago has a procedure, set forth in Special Order 02-25, to address accidental property damages caused by the Chicago Police Department during official business, including damage caused during the execution of search warrants. Exh. W (Department Special Order 02-25).

70. The procedure outlines the responsibilities of the Chicago Police Department members, the supervisors, watch commanders, and district commanders. See id.

71. Once a claim notification has been received by the City's Department of Law, an adjuster is assigned to evaluate the claim. Id.

72. Special Order 02-25 provides that "Citizens' questions regarding a claim will be directed to the Department of Law, Torts Division, during normal business hours at 312-744-5650." Id. at 4.

                                      Respectfully submitted,

                                      *s/ Gail Reich*
                                      Meera Werth
                                      Gail Reich
                                      Assistants Corporation
                                      (for the individual defendant)

                                      *s/ Tiffany Harris*
                                      Tiffany Harris
                                      Assistant Corporation Counsel
                                      (attorney for the City of Chicago)

30 North LaSalle Street
Room 900
Chicago, Illinois 60602
312-742-5146/744-1975/744-7684